**IT IS ORDERED as set forth below:**



**Date: November 17, 2020**

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE:<br><br>SUGARLOAF CENTRE, LLC,<br><br>    Debtor. | CASE NO. 15-58442-WLH<br><br>CHAPTER 11 |

## ORDER ON FINAL APPLICATION FOR COMPENSATION FILED BY
## MORRIS, MANNING & MARTIN, LLP

**THIS MATTER** is before the Court on the Sixth and Final Application for Compensation

and Supplement to Final Fee Application (Case No. 15-58442 Docs. Nos. 161 & 189) (the

"Applications") filed by Morris, Manning & Martin, LLP, pursuant to which it seeks final approval

of all fees paid to it under the First through Fifth Applications in the amount of $246,939.94,

together with an additional $72,644.48 for fees withheld in the Fifth Application and fees sought

in the Sixth and Final Application and Supplement, for a total of $319,584.42.

1

## I.    FACTS

The Debtor, together with its affiliates, Bay Circle Properties, LLC ("Bay Circle"), DCT Systems Group, LLC ("DCT"), Nilhan Developers, LLC ("Nilhan Developers"), and NRCT, LLC ("NRCT") (collectively the "Debtors"), each filed a petition for relief under Chapter 11 of the Bankruptcy Code on May 4, 2015. On June 8, 2015, the Court administratively consolidated the Debtors' cases. The manager of each of the Debtors is Chuck Thakkar. Ownership in each debtor differs somewhat but, in general in each debtor, ownership is held by some combination of Mr. Thakkar, his children Rohan and Niloy, his wife, and/or a company which some combination of the Thakkar family owns.

The immediate reason for filing bankruptcy was a default by the Debtors on a series of loan agreements with Wells Fargo Bank, N.A.[1] Eleven days into the case, Wells Fargo filed a Motion for the Appointment of a Chapter 11 Trustee (Case No. 15-58440 Doc. No. 12). After an evidentiary hearing, the Court denied the request and appointed an examiner instead (Case No. 15-58440 Doc. No. 134). The examiner served until November 30, 2016 and prepared several reports regarding the Debtors, their cash management systems, and intercompany debts (Case No. 15-58440 Docs. Nos. 157, 274, 304, and 414).

The obligations to Wells Fargo were secured by certain real property owned by the Debtors. The first several months of these cases were devoted to the Debtors liquidating or refinancing various pieces of property to meet milestone payment deadlines agreed to by Wells Fargo. As one of the milestone payments was approaching, Bay Circle sought to sell its property. Good Gateway, LLC and SEG Gateway, LLC (collectively "Gateway") held a judgment lien on Mr. Thakkar's one-half interest in the Bay Circle property when Mr. Thakkar conveyed the property to Bay

---

[1] Wells Fargo Bank, N.A. began its association with the Debtors in 2008. The history is set out in several prior orders issued by the Court, including the Order Denying Substantive Consolidation (Case No. 15-58440 Doc. No. 797).

Circle.  Gateway objected that its interest in the Bay Circle property was unnecessarily lost and

asked for adequate protection of the lien it lost by virtue of the sale of the Bay Circle property.

The Court approved the sale and provided Gateway a replacement lien on Bay Circle's claims for

contribution and subrogation (Case No. 15-58440 Doc. No. 797).  The Court later modified the

adequate protection order to clarify the order was intended to provide Gateway with adequate

protection of its judgment lien to the extent the sale of Bay Circle's property impaired the value of

Gateway's lien, without prejudice to any defenses that might be raised to subrogation and

contribution, and that the lien was only on the net proceeds of Bay Circle's claims against the other

Debtors (Case No. 15-58440 Doc. No. 1125).[2]

Behind the scenes, these bankruptcy cases have been impacted and driven to a certain

extent by litigation between Mr. Thakkar and his family, on the one hand, and Gateway, on the

other.  Gateway obtained judgments in the amounts of $2.5 million and $12 million against Mr.

Thakkar, NCT Systems, Inc, and other non-debtor entities in a Florida state court.  Due to

subsequent litigation, Gateway claims multiple interests in the Debtors' cases, including an equity

interest in NCT, which holds an indirect equity interest in Sugarloaf; an interest in NRCT (by way

of a judgment it holds against Rohan Thakkar, who is a 50% owner of NRCT, which itself has an

indirect ownership interest in Sugarloaf); 50% of any recovery by Nilhan Financial, LLC, a

creditor of the Debtors; and the adequate protection claim in the Bay Circle case.

Gateway filed claims in the cases, all of which were disallowed except the claim in Bay

Circle.  Gateway also filed a Motion for Relief from Stay (Case No. 15-58440 Doc. No. 307) early

in the cases seeking to continue litigation in the Florida courts, which the Court denied (Case No.

---

[2] The Court approved Gateway's standing to pursue contribution and/or subrogation claims of Bay Circle (Case No.
15-58440 Doc. No. 1137), and Gateway filed an adversary complaint on behalf of the Trustee against NRCT with
respect to Bay Circle's contribution claim on August 13, 2019, initiating Adversary Proceeding No. 19-05284.  The
adversary proceeding remains pending.

15-58440 Doc. No. 380).  The parties remain determined to litigate though, as evidenced by the numerous cases filed in this Court, Florida, and elsewhere.  In fact, Mr. Thakkar has testified that he will continue to litigate with Gateway forever (see Transcript of Hearing on December 4, 2020, Case No. 15-58440 Doc. No. 936 at 147 line 12 (Mr. Thakkar stated he intended to appeal "till I die.")).  In these bankruptcy cases, there have been six adversary proceedings and at least as many appeals, although not all are directly related to Gateway.

On December 11, 2018, after notice and a hearing, the Court appointed a Chapter 11 Trustee in all five cases (Case No. 15-58440 Doc. No. 919).  The appointment was triggered by Mr. Thakkar's actions in the Nilhan Developers case where, without notifying the Court or his counsel and without Court approval, Mr. Thakkar exercised an option to re-acquire property for over $9 million and incurred unauthorized secured post-petition financing in that amount from an insider (for over $5 million) and a third party.  The Court appointed Ronald L. Glass as Chapter 11 Trustee for all the Debtors (Case No. 15-58440 Doc. No. 922).  Mr. Thakkar sought reconsideration of the order appointing a trustee (Case No. 15-58440 Doc. No. 947), which the Court considered at a hearing on February 7, 2019 and denied (Case No. 15-58440 Doc. No. 1248).

The Trustee sought to retain Morris Manning and Martin, LLP ("MMM") as his counsel. Mr. Thakkar objected to the retention of MMM, and MMM filed a brief in support of the Trustee's application.  The Court considered the Application to Retain MMM at a hearing on January 17, 2019, at which Mr. Thakkar voiced opposition to MMM's retention since MMM had potentially represented entities with interests adverse to Mr. Thakkar personally or other non-debtor entities. The Court instructed Mr. Thakkar to provide MMM with a list of parties against which the firm

should check for conflicts.  Mr. Thakkar failed to provide a list of entities as instructed,[3] so MMM researched other Thakkar entities, ran a conflicts check on over 100 entities, and filed a supplemental brief and affidavit in support of its retention (Case No. 15-58440 Docs. Nos. 970 & 971).  The Court held a continued hearing on February 7, 2019, after which the Court approved the retention of MMM (Case No. 15-58440 Doc. No. 976).

At the initial status conference with the Trustee on December 18, 2018, the Court requested the Trustee address several issues including: assessing the potential contribution claim of Bay Circle, resolving pending litigation, and bringing these cases to a final disposition.  The Trustee reviewed the assets and liabilities of each debtor and filed a Status Report on February 26, 2019 with his initial findings and questions (Case No. 15-58440 Doc. No. 983).  After a failed attempt at mediating a global settlement of all issues, including those involving Gateway, the Trustee moved forward in each case to bring matters to a posture to be decided by the Court.  At that point, the cases were all taking different paths to resolution and the cases were severed on May 5, 2020 (Case No. 15-58440 Doc. No. 1420).

A.   Facts Regarding Sugarloaf

Sugarloaf is 100% owned by Sugarloaf Centre Partners, LLC, which is in turn owned 50% by NRCT (one of the Debtors) and 50% by NCT Systems, Inc.  Gateway claims it owns 100% of NCT Systems, Inc., but this allegation is disputed by Mr. Thakkar.  When the petition was filed, Sugarloaf owned vacant land at 1930 Satellite Blvd., Duluth, Georgia; a retail shopping center located at 1950 Satellite Blvd., Duluth, Georgia; and a single-story building at 1970 Satellite Blvd., Duluth, Georgia.

---

[3] As detailed in MMM's Supplemental Affidavit, Mr. Thakkar provided counsel with certain names including "Any entity owned by Thakkars."  Counsel asked Mr. Thakkar to provide names of specific entities since she did not know the entities he and his family owned and/or with which they were affiliated.  Mr. Thakkar failed to do so.

To pay down the Wells Fargo debt according to the deadlines set in the bankruptcy case, the Court authorized Sugarloaf to borrow $7,500,000 from Simba Global PTY LTD ("Simba"), a registered Australian proprietary limited company (Case No. 15-58440 Doc. No. 454) (the "Financing Order"). A note in that amount was executed on October 28, 2016 with a maturity date of October 30, 2019 (the "Simba Note"). Sugarloaf granted Simba a first priority lien on all of Sugarloaf's real property at 1930, 1950, and 1970 Satellite Blvd. Later, on June 13, 2017, Simba moved the Court to modify the Financing Order (Case No. 15-58440 Doc. No. 699), which motion the Court granted on August 1, 2017 (Case No. 15-58440 Doc. No. 728). No other entries were made on the docket regarding the Simba Note, and the Simba Note was not discussed at any hearings, until the Trustee was appointed. The Trustee's February 2019 report disclosed that Simba transferred its security deed to Red Chillies Holdings Financial, LLC ("Red Chillies"), which the Trustee later learned was a Delaware corporation controlled by Mr. Thakkar. The assignment modified the security deed by changing the legal description to include only the property located at 1950 and 1970 Satellite Blvd. (and not the 1930 Satellite Blvd. property).

A couple of weeks after the Red Chillies assignment, Red Chillies executed an assignment in favor of Westmoore Lending Partners IV LLC ("Westmoore"), which was executed by Mr. Thakkar as manager of Red Chillies. On February 13, 2019, the Trustee requested and received a payoff from Westmoore stating Westmoore would be satisfied by payment of $3 million plus interest (Case No. 15-58440 Doc. No. 983 Ex. C). The Trustee then ordered a title report and, upon confirming that the property at 1930 Satellite Blvd. was unencumbered, began the process of selling the property.

The Court approved the sale of 1930 Satellite Blvd. for $1.5 million to Discovery Funding LLC on May 2, 2019 (Case No. 15-58440 Doc. No. 1033). As a result of the sale, the Trustee

received proceeds in the amount of $1,437,961.68, after paying costs and commissions (Case No. 15-58440 Doc. No. 1185). The Trustee did not sell the property at 1950 and 1970 Satellite Blvd. Notwithstanding Westmoore's prior representation to the Trustee, on April 14, 2020, Westmoore filed a proof of claim for $9,147,349.54 secured by Sugarloaf's property at 1950 and 1970 Satellite Blvd. (Case No. 15-54880 Claim No. 11-1) (the "Westmoore Proof of Claim"). Mr. Thakkar ultimately did not oppose that amount of the claim. While there is speculation as to why the claim tripled, the Court makes no finding in that respect.

        B.   <u>Plan and Dismissal</u>

At various points throughout the case, Mr. Thakkar has sought to dismiss this and the other Debtors' cases. Mr. Thakkar, acting *pro se* as managing member of the Debtors, filed a Motion to Dismiss (Case No. 15-58440 Doc. No. 1060) on May 20, 2019. With the assistance of counsel, he filed an Amended Motion to Dismiss on July 9, 2019 (Case No. 15-58440 Doc. No. 1134), which adopted and amended his previous motion to dismiss. The Trustee filed a response in opposition later that month (Case No. 15-58440 Doc. No. 1160), arguing the proposal to dismiss the cases upon paying some but not all claims constituted an impermissible structured dismissal. The Trustee filed a supplemental response in opposition to dismissal on January 9, 2020 (Case No. 15-58440 Doc. No. 1280).

Before the Court heard the requests for dismissal, the Trustee filed a Motion for Order Directing Mediation (Case No. 15-58440 Doc. No. 1193, amended at Doc. No. 1194). No one objected, and the Court authorized and directed mediation and appointed retired Bankruptcy Judge Mary Grace Diehl as mediator (Case No. 15-58440 Doc. No. 1201). The Trustee and his counsel, among others, attended the mediation on October 24 and 25, 2019, which then continued telephonically for several days thereafter.

After the mediation concluded with no agreement, the Court held a status hearing on November 14, 2019, after which it scheduled a hearing on Mr. Thakkar's Motion to Dismiss and his Amended Motion to Dismiss as to Sugarloaf for January 16, 2020.  At that hearing, the Court denied the motion to dismiss without prejudice.  The Court directed any eligible party desiring to file a plan to do so by February 18, 2020.  The Court further ordered that if no plan of reorganization was filed as to Sugarloaf by February 18, 2020, it would hold a hearing on February 19, 2020, for the Debtor, the Trustee and parties in interest to show cause why the case should not be converted to Chapter 7 (Case No. 15-58440 Doc. No. 1286).

The Trustee filed a Chapter 11 Plan of Liquidation (Case No. 15-58440 Doc. No. 1315) and Disclosure Statement (Case No. 15-58440 Doc. No. 1316) on February 18, 2020.  Mr. Thakkar, together with Niloy and Rohan, also filed a Chapter 11 Plan (Case No. 15-58440 Doc. No. 1323) and Disclosure Statement (Case No. 15-58440 Doc. No. 1324).  A hearing was scheduled for March 24, 2020 on the disclosure statements filed by the Trustee and by Mr. Thakkar and his sons. The day before the hearing, counsel for Mr. Thakkar and his sons filed an Amended Plan and Disclosure Statement (Case No. 15-58440 Docs. Nos. 1350 & 1351).

At the hearing on March 24, 2020, it became clear there was no consensus between the Trustee and Mr. Thakkar as to who held the Simba Note or the amount due.  The Court set a bar date for anyone claiming a secured interest in the Sugarloaf property to file a proof of claim by April 14, 2020, and a deadline to object of May 14, 2020.  Westmoore was the only entity to file a claim, which was in the amount of $9,147,349.54.

The Trustee ultimately objected to and settled Westmoore's claim.  Once the settlement was approved, the Trustee filed a Motion to Dismiss on August 5, 2020 (Case No. 15-58442 Doc. No. 147).  Mr. Thakkar filed an objection in which he did not oppose dismissal, but he objected to

the payment of certain debts and requested the Court set a deadline for the Trustee's professionals to file fee applications (Case No. 15-58442 Doc. No. 159).  The Court held a hearing on the Motion to Dismiss on August 27, 2020 at which the Court found dismissal was warranted.  The Court granted the Motion to Dismiss, subject to the final fee applications being approved, on August 28, 2020 (Case No. 15-58442 Doc. No. 164).

   C. <u>Fee Applications</u>

   MMM filed five interim fee applications.  The Second, Third, and Fourth applications were unopposed.  All five were granted by the Court, though the Court only approved 90% of the fees sought in the Fifth Application and reserved the remaining 10% for further consideration upon final application.  To date, counsel has been paid fees in the amount of $246,939.94.  In its Sixth and Final Fee Application and Supplement, MMM seeks allowance and payment of an additional $72,644.48 in fees (including the amount withheld from the Fifth Interim Fee Application), for a total of $319,584.42.

   MMM filed its First Interim Fee Application (Case No. 15-58440 Doc. No. 1023) on April 19, 2019 for fees and expenses incurred from December 11, 2018 through March 31, 2019.  Counsel not only sought compensation for work done in each of the individual bankruptcy cases, but it also sought fees and expenses for "general" work done on behalf of all the Debtors, which it divided by all five Debtors.  The First Interim Fee Application included fees and expenses incurred at the outset of the case reviewing the docket and the various schedules, examiner's reports, relationships among the Debtors and other entities, reviewing monthly operating reports for the Debtors, and attending status conferences.  MMM also spent time preparing the motions to retain MMM and GlassRatner, including conducting an extensive conflicts check, and their initial fee applications as well as responding to Thakkar's motion to reconsider appointing a trustee and

9

Thakkar's objection to MMM's retention.  In the Sugarloaf case, counsel worked on matters regarding Sugarloaf's property, including preparing a settlement with a tenant, evaluating a potential sale, reviewing the Simba Note and related title report, and obtaining a payoff from Westmoore.

Mr. Thakkar, as managing member of the Debtor, filed an objection (Case No. 15-58440 Doc. No. 1044).  He also filed a motion to continue the hearing on the interim fee application (Case No. 15-58440 Doc. No. 1058), stating he believed the fees were excessive and for services beyond the scope of what was required.  The Trustee responded that Mr. Thakkar did not have standing to object to MMM's fees and it was Mr. Thakkar's conduct that caused the Trustee to incur additional fees and expenses (Case No. 15-58440 Doc. No. 1071).  The Court held a hearing on May 30, 2019, after which it authorized the Trustee to pay MMM a total of $51,509.02, consisting of $36,942.50 for fees specific to Sugarloaf plus $14,566.52 for its allocable share of general fees and expenses incurred by all the Debtors (Case No. 15-58440 Doc. No. 1083).

MMM filed its Second Interim Fee Application (Case No. 15-58440 Doc. No. 1173) on August 9, 2019 seeking fees and expenses incurred from April 1, 2019 through August 2, 2019. The Second Interim Fee Application covered work in the Sugarloaf case regarding the 1930 Satellite Blvd. sale, including drafting and presenting the motion to sell and the subsequent motion to approve construction of a hotel on the property.  The "general" category applicable to multiple Debtors included fees for preparing and revising MMM's and GlassRatner's fee applications, reviewing and responding to Mr. Thakkar's motion to dismiss, and consultations about Nilhan Financial's claims in the various cases.  No objections were filed, and the Court approved the Second Interim Fee Application and authorized the Trustee to pay MMM a total of $51,631.65, consisting of $36,265.50 for fees specific to Sugarloaf plus $15,366.15 for general fees and

expenses incurred by all the Debtors split 1/3 between Sugarloaf, Nilhan Developers, and NRCT (Case No. 15-58440 Doc. No. 1198).

MMM filed its Third Interim Fee Application (Case No. 15-58440 Doc. No. 1268) on November 20, 2019 seeking fees and expenses for the period August 3, 2019 through October 31, 2019, including fees and expenses related to preparing for and attending the mediation and further discussions regarding Gateway's interests and Nilhan Financial's claims.  No objections were filed, and the Court granted the request for $523.50 in fees specific to Sugarloaf and $23,176.78 for 1/3 of the general fees and expenses incurred by all Debtors (split between Sugarloaf, Nilhan Developers, and NRCT), for a total of $23,700.28 (Case No. 15-58440 Doc. No. 1272).

MMM filed its Fourth Interim Fee Application (Case No. 15-58440 Doc. No. 1349) on March 23, 2020 seeking $20,385.00 for fees incurred in the Sugarloaf case and $21,087.67 for 1/3 of the general fees (split between Sugarloaf, NRCT, and Nilhan Developers) for a total of $41,472.67, covering the period of November 1, 2019 through February 29, 2020.  The Fourth Interim Fee Application covered the period after the mediation concluded without a settlement and the Trustee and his counsel considered possible ways to resolve the case, including a potential sale of Sugarloaf's remaining property, formulating a plan and disclosure statement, and reviewing and responding to Mr. Thakkar's plan and disclosure statement.  No objections were filed, and the Court entered an order approving the fees on April 14, 2020 (Case No. 15-58440 Doc. No. 1380).

MMM filed its Fifth Interim Fee Application (Case No. 15-58442 Doc. No. 144) on August 14, 2020 seeking $75,825.00 for fees incurred in the Sugarloaf case and $11,537.48 for 1/3 of the general fees and expenses (split between Sugarloaf, NRCT, and Nilhan Developers) for a total of $87,362.28 covering the period March 1, 2020 through July 16, 2020.  The Fifth Interim Fee Application included fees incurred in the plan process and investigating, objecting to, and

ultimately settling Westmoore's proof of claim.  Mr. Thakkar filed an objection on August 11, 2020 (Case No. 15-58442 Doc. No. 148).  The Court held a hearing on August 13, 2020, after which it awarded MMM 90% of its requested fees and 100% of expenses for $78,626.32 and reserved 10% for consideration with a final application (Case No. 15-58442 Doc. No. 154).

MMM filed its Sixth and Final Application for Fees on August 26, 2020 (Case No. 15-58442 Doc. No. 161) seeking $23,694.82, of which $19,949.00 related to Sugarloaf and $3,745.82 was for 1/3 of the general fees and expenses (split between Sugarloaf, NRCT, and Nilhan Developers) covering the period July 17, 2020 through August 25, 2020.  The Sixth Fee Application sought fees related to the Westmoore settlement, drafting and prosecuting the Trustee's motion to dismiss, and preparing the final fee applications for MMM and GlassRatner, and sought the $8,736.16 deferred from the Fifth Interim Fee Application.  Mr. Thakkar objected (Case No. 15-58442 Doc. No. 169).  MMM filed a Supplement to Final Fee Application (Case No. 15-58442 Doc. No. 189) on October 13, 2020, stating it had incurred $3,582.00 in connection with the motion to dismiss and $36,631.50 preparing for and participating in hearings on the Applications.

D.   Summary of Objections

Mr. Thakkar objected to MMM's Applications.  His written objection says he does not object to the First or Second Applications for fees, but objections were lodged at the hearing.  His written objection states he objects to any fees to MMM identified in all other fee applications with the exception of $4,971.94.

The Court held an evidentiary hearing on the Applications on October 6, 2020,[4] which was continued to October 14 and 15, 2020.  Counsel for the Chapter 11 Trustee, Frank DeBorde and

---

[4] On October 1, 2020, Mr. Thakkar filed a Motion for Continuance seeking to continue the evidentiary hearing scheduled for October 6, 2020 and asking the Court to consider his request on an expedited basis (Case No. 15-58442

Lisa Wolgast, and counsel for Mr. Thakkar, Denise Dotson, appeared in person, while counsel for

Gateway, Clay Townsend, appeared by telephone.  Frank DeBorde, Ron Glass, Joel Murovitz, and

Mr. Thakkar testified.  After hearing and receiving evidence and argument from counsel, the Court

took the matter under advisement.  On October 21, 2020, Mr. Thakkar filed a supplemental

objection to MMM's fees in which he restated his objections previously presented at the hearing

on the Applications (Case No. 15-58443 Doc. No. 193, amended at Doc. No. 194), to which the

Trustee responded (Case No. 15-58443 Doc. No. 195).

After reviewing the objections and clarifying the points of objection at the hearing, the

Court categorizes the objections to the MMM applications as follows:

1. The time spent preparing the first fee application was excessive.
2. The time spent on MMM's retention was excessive.
3. The time spent on the sale of the 1930 Satellite Blvd. property was excessive.
4. Sugarloaf did not benefit from time spent on mediation and should not share in that cost.
5. The filing of a plan and disclosure statement was unnecessary and the time spent was not beneficial to the estate.
6. The "general" fees were not properly allocated among the Debtors.
7. The time spent investigating and litigating the Westmoore claim was not for the benefit of the estate but only for Gateway's benefit.
8. The time incurred defending the fee application is not recoverable.

The Court will address each contention.

## II.   LAW ON FEE APPLICATIONS

"Reasonable" compensation for trustees and their attorneys is permitted under 11 U.S.C.

§ 330 for "actual, necessary services rendered by the trustee" or his attorney.   11 U.S.C.

§ 330(a)(1)(A).  The burden is on the attorney seeking compensation to prove that the requested

---

Docs. Nos. 177 & 178).  The Court granted the request for expedited consideration and held a telephonic hearing on the Motion for Continuance on October 1, 2020, after which it denied the Motion for Continuance (Case No. 15-58442 Doc. No. 181).  At 6:27 a.m. on October 6, 2020, the morning of the scheduled hearing, Mr. Thakkar filed a Second Motion for Continuance (Case No. 15-58442 Doc. No. 158) in which he again sought to continue the evidentiary hearing for a period of 45 days.  The Court considered the request at the hearing on October 6, 2020 and found no cause to continue the evidentiary hearing.  Accordingly, it denied Mr. Thakkar's Second Motion to Continue (Case No. 15-58442 Doc. No. 186).

compensation is reasonable.  See In re Dabney, 417 B.R. 826, 834 (Bankr. N.D. Ga. 2009).

Reasonableness is determined by applying a lodestar analysis, looking at the hours reasonably

spent and the reasonable hourly charge.  See Norman v. Housing Authority of the City of

Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988).  To determine whether the hourly rates and

number of hours expended are reasonable, the Court must take into account all relevant factors,

including those specified in section 330.  The statute provides that courts should consider the

following:

> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at
> the time at which the service was rendered toward the completion of, a case under
> this title;
> (D) whether the services were performed within a reasonable amount of time
> commensurate with the complexity, importance, and nature of the problem, issue,
> or task addressed;
> (E) with respect to a professional person, whether the person is board certified or
> otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation
> charged by comparably skilled practitioners in cases other than cases under this
> title.

11 U.S.C. § 330(a)(3).  Bankruptcy courts "must also consider whether the bankruptcy assets were

administered as economically as possible and whether any of the services rendered were

duplicative or non-legal."  Grant v. George Schumann Tire & Battery Co., 908 F.2d 874, 878 (11th

Cir. 1990).

The size of a fee request may invite a close review, but size alone is not grounds to disallow

a fee.  In re Marshall, 2010 WL 3959612, at *63 (Bankr. E.D. Va. Oct. 11, 2010).  Instead, the

court must consider fees in the context of the tasks undertaken and whether they are reasonable

and necessary, looking at the nature of the problems faced, the work done to address them, and

any opposition or cooperation the trustee received.  The leading case with regard to the factors to

be considered in determining a reasonable allowance of compensation for attorneys is <u>Johnson v.</u>

<u>Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974), in which\h the court considered the

following twelve factors:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions presented by the case;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to acceptance of a case;
> (5) the customary fee for similar work in the community;
> (6) whether the fee is fixed or contingent;
> (7) time pressures imposed by the client or the circumstances;
> (8) the amount involved and results obtained as a result of the attorneys' services;
> (9) the experience, reputation and ability of the attorneys;
> (10) the desirability of the case;
> (11) the nature and length of the professional relationship with the client; and
> (12) awards in similar cases.

<u>Id.</u> at 717-719.  Each <u>Johnson</u> factor must be considered in light of the other factors.  <u>Neville v.</u>

<u>Eufaula Bank & Trust Co. (In re U.S. Golf Corp.)</u>, 639 F.2d 1197, 1205 (5th Cir. 1981).

In order to properly object to an application for compensation, the objecting party must

prove, with specific evidence, that the requested fees are unreasonable.  <u>See</u> <u>In re SGE Mortgage</u>

<u>Funding Corp.</u>, 301 B.R. 915, 917 (Bankr. M.D. Ga. 2003).  A general objection to all fees and

expenses is not proper, and "[g]eneral dissatisfaction or a disagreement over business judgment

will not suffice" to support an objection to fees.  <u>Id.</u>; <u>see also</u> <u>In re Golf Augusta Pro Shops, Inc.</u>,

2004 WL 768576, at *2 (Bankr. S.D. Ga. Feb 6, 2004) (overruling objection that generally

complained that certain tasks were not necessary and applicant spent too much time on them

without providing specific details).

Additionally, section 330(a)(4)(A) provides that a court should not award compensation

for certain services.  The section states:

> Except as provided in subparagraph (B), the court shall not allow compensation
> for—
>> (i) unnecessary duplication of services; or

(ii) services that were not—
      (I)      reasonably likely to benefit the debtor's estate; or
      (II)     necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A).  Examples of services that do not benefit the estate are work performed on non-bankruptcy matters, services rendered to benefit the debtor personally, and services that were actually in opposition to the estate's administration.  See In re Watervliet Paper Co., 109 B.R. 733, 735 (Bankr. W.D. Mich. 1989).

But legal services may be "reasonably likely" to benefit a Chapter 11 estate even if no plan of reorganization is proposed or confirmed.  In re Macco Props., Inc., 540 B.R. 793, 868 (Bankr. W.D. Okla. 2015).  "Benefit to the estate … is not restricted to success measured by confirmation of a plan or the prospect of confirming a plan."  In re Kitts Dev., LLC, 474 B.R. 712, 721 (Bankr. D.N.M. 2012).  A professional does not have to be 100 percent successful.  In re Cenargo Int'l, PLC, 294 B.R. 571, 596 (Bankr. S.D.N.Y. 2003).  The question is whether a reasonable trustee or his professional would have believed a particular service would benefit the estate.  Id. at 595–96.  For example, counsel's advice and services may benefit the estate "by maximizing value for creditors through an orderly or emergency liquidation of assets by Section 363 sales."  Kitts Dev., 474 B.R. at 721.  Moreover, "[t]he appropriate time for measuring benefit to the estate is as of the time the services are provided, and not at the time the court ultimately reviews the fee application."  Macco Props., 540 B.R. at 868 (quoting In re Schupbach Investments, LLC, 521 B.R. 449 (table) (B.A.P. 10th Cir. 2014)).  Thus, "[c]ourts may allow compensation where counsel's services promoted the bankruptcy process and contributed to the administration of the estate, but did not otherwise provide an economic benefit to the estate."  Id.

"In addition, '[n]ecessary and actual fees are allowable in situations where the fees are unavoidably incurred,' such as responding to events not subject to counsel's control, 'even if they

are not of a benefit to the estate.'" <u>Macco Props.</u>, 540 B.R. at 868 (quoting <u>Van Cott, Bagley,</u>

<u>Cornwall & McCarthy v. B.R.&F., L.C. (In re Ricci Inv. Co.)</u>, 217 B.R. 901, 907 (D. Utah 1998)).

The amount of time reasonably necessary in a particular case depends in part on the vigor with

which opponents dispute the issues, and counsel cannot be expected to ignore objections made by

opposing parties. <u>See</u> <u>Macco Props.</u>, 540 B.R. at 871.  For example, courts often find services are

necessary, even if they do not ultimately benefit the estate, where there are many obstacles to

closing a sale and incurring fees is essentially unavoidable.  <u>See</u> <u>id.</u>  Counsel must also comply

with the direction of the court.  <u>Ricci Inv. Co.</u>, 217 B.R. at 906-07 (finding fees were necessarily

incurred where counsel had no choice but to respond to objections and go forward with the

scheduling order as mandated by the court).

## III.  STANDING

Before addressing the specific objections, the Court must address Mr. Thakkar's standing

to object.  According to his objections, he is objecting just as Mr. Thakkar, and he does not identify

another capacity in which he is objecting.  Likewise, on cross examination, Mr. Thakkar did not

know in what capacity he was objecting.  In his supplemental response, he states he has standing

because of the Westmoore debt.  At the hearing, his counsel stated he has standing for three reasons

because: 1) he is the former manager of the Debtor; 2) he is the manager of the equity interest

holder; and 3) he is a guarantor of the Westmoore debt (a reduction in fees resulting in a greater

distribution to Westmoore benefits him personally through a reduction in his guaranty).   No

evidence was presented on any of these points.

Under section 1109(b), "[a] party in interest, including the debtor, the trustee, a creditors'

committee, an equity security holders' committee, a creditor, an equity security holder, or any

indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."

17

11 U.S.C. § 1109(b).  But, even if an objector does not qualify as a party in interest under this section, the bankruptcy court has a duty to review fee applications notwithstanding the absence of objections by the trustee, debtor, or creditors."  Lobel & Opera v. U.S. Trustee (In re Auto Parts Club, Inc.), 211 B.R. 29, 33 (B.A.P. 9th Cir. 1997) (citing In re Busy Beaver Building Centers, Inc., 19 F.3d 833, 841 (3d Cir. 1994)); 11 U.S.C. § 330.  Bankruptcy judges have broad discretion in reviewing and awarding attorney's fees and expenses.  See Grant, 908 F.2d at 878.

For example, in In re Sarkis Investments Co., LLC, 2019 WL 9243005, at *6 (Bankr. C.D. Cal. Sept. 5, 2019), the fee objector was a beneficiary of a trust, which was the sole member of the limited liability company that was the sole member of another limited liability company that was the debtor's sole equity interest holder.  The court found the objector did not have standing as a party in interest because she did not have a legal right that could be affected by the fee applications. Id. at *8. The court continued, however, to review the fee requests, noting the court has an independent duty to investigate the reasonableness of compensation even in the absence of any objection voiced by a party in interest.  Id. at *10.

As the Court noted at the hearing on October 6, 2020, though Mr. Thakkar has been the manager of the Debtor and aided in driving the Debtors' cases, his standing is attenuated. Nevertheless, the Court allowed Mr. Thakkar to proceed, noting the Court has an independent duty to review professional fees.  Just as the court found in Sarkis Investments Co., this Court finds it must consider the reasonableness of the compensation requested and will review each of the Applications.

## IV.    OBJECTIONS TO APPLICATIONS

Although Mr. Thakkar raised numerous objections, no dispute exists as to many of the factors the court must consider under section 330 and Johnson.  There is no dispute that the time

claimed by MMM was actually spent, and the Court finds the time is accurately recorded.  There
is no dispute as to the reasonableness of the rates, that the rates are customary, or that MMM has
the skill and experience to render the services.  The Court finds the rates to be reasonable and
customary and MMM is skillful and experienced.

      The fees for counsel of a trustee are both fixed and contingent.  On one hand, the amount
to be paid is fixed by an hourly rate; on the other hand, the fee has an element of contingency since
the amount a court will allow is uncertain as is the availability of assets to pay the allowed fees.
While MMM previously represented Mr. Glass in other unrelated matters, this prior representation
does not factor into the consideration of the nature and length of the professional relationship with
the client because prior representations may not be of Mr. Glass as a trustee and, even if they are,
he would be serving as a trustee of a different debtor.  In this case, the objections are focused on
1) whether the services were necessary to the administration of or beneficial to the estate, and 2)
whether the services were performed within a reasonable amount of time commensurate with the
complexity, importance, and nature of the task.

      In reviewing the Applications, the Court is particularly aware that representing a Chapter
11 trustee is a unique and complex assignment.  The Court notes a Chapter 11 trustee is only
appointed in certain circumstances.  The appointment of a Chapter 11 trustee is an extraordinary
remedy and is the exception, rather than the rule.  See In re Intercat, Inc., 247 B.R. 911, 920 (Bankr.
S.D. Ga. 2000).  Once appointed, a Chapter 11 trustee's duties run to the estate and not a specific
creditor.  In re Vill. Concepts, Inc., 2019 WL 2252497, at *4 (Bankr. E.D. Cal. May 17, 2019).
The trustee and counsel are thrown into a case they know nothing about.  That is especially true
here since the cases were pending for over three years and the docket included over 900 entries by
the time the Trustee was appointed.  Moreover, when a trustee is appointed in a Chapter 11 case,

19

by definition, something is awry in the case and the trustee is expected to act immediately to secure assets and address the issues causing the appointment. Almost always, a trustee's presence in a Chapter 11 case is unwelcome by the debtor, and obtaining cooperation is typically more challenging than if the attorney were representing the debtor. The Court must therefore consider the situation in which MMM found itself as a result of the Court's appointment of a trustee when reviewing the applications.

    A.    <u>Time on Retention Application</u>

MMM's First Fee Application reflects MMM incurred $19,093.50 in fees in connection with its retention application and that of GlassRatner. That amount was divided by all five Debtors, so Sugarloaf's allocable share is $3,818.70. While this may seem high, the cost reflects the time spent responding to Mr. Thakkar's objections, to which counsel was obligated to respond.

Mr. Thakkar objected to the Trustee's applications to retain both MMM and GlassRatner (Case No. 15-58440 Docs. Nos. 935 & 960). At the January 17, 2019 hearing, Mr. Thakkar objected and expressed serious concern about MMM's relationships, not only with the Debtors but also with potential purchasers and Mr. Thakkar's many other entities. As a result, MMM searched 113 entities for conflicts and filed a supplemental affidavit and a brief in support of its retention application. After a second hearing on February 7, 2019, the Court approved the application to retain MMM.

The Court finds these fees are allowable because they were unavoidably incurred. Mr. Thakkar vigorously opposed MMM's retention and the Court asked MMM to search the additional entities identified by Mr. Thakkar. Counsel cannot be expected to ignore objections made by opposing parties, and fees are allowable when incurred in responding to events outside counsel's control. Based on the objections lodged by Mr. Thakkar and the additional work done by MMM

in response, the Court finds these charges were necessary to the administration of the estate and the amount of time spent was commensurate with the issues addressed.

### B.    Time Preparing Fee Applications

MMM's Second Interim Fee Application reflects charges of $17,414.50, which were incurred in preparing the MMM and GlassRatner First and Second Interim Fee Applications. These charges were divided by four, so the charge to Sugarloaf was $4,353.63.  Mr. Thakkar complains these charges are excessive because time was spent deciding how to allocate time among the Debtors and among different work codes.  He claims this is an administrative issue for MMM and not subject to reimbursement by the estate.  The Court disagrees.  The charge is for four fee applications (the First and Second Interim Fee Applications for both MMM and GR), which breaks down to a charge of approximately $1,100 per application.  This is a very fair amount. It is also understandable that the first round of applications took longer to prepare as counsel was just becoming familiar with the cases and the intricate relationships among and between the Debtors, the Thakkar family, and various other related entities, all of which Mr. Thakkar set up. The Court concludes the charges were necessary to the administration of the estate and the amount of time spent was commensurate with the task undertaken.

### C.    Mediation

On August 30, 2019, the Trustee, at the Court's suggestion, filed a Motion for Order Directing Mediation, which was amended the next day.  In the motion, the Trustee asked that all disputes, claims and interests in the bankruptcy cases be mediated including, without limitation, nine specific issues.  The issues included several directly related to Sugarloaf: Gateway's claims against any equity interests in Debtors, including its alleged equity interest in Sugarloaf; whether any of the remaining real property of Sugarloaf should be marketed and sold; the amount owed to

Nilhan Financial by each of the Debtors (which included Sugarloaf); avoidance and recovery of transfers by any of the Debtors to affiliates or insiders; whether any of the Debtors were subject to veil piercing claims; and issues related to any potential plan of reorganization for the Debtors, including the distribution of funds currently held by the Trustee (which included funds the Trustee held as a result of a sale of some of Sugarloaf's property).  No one objected to the request for mediation.  The mediation occurred over two days in October 2019 and continued telephonically for several days thereafter.  Many parties were involved including the Trustee, Mr. Thakkar, his sons, a Nilhan Financial representative, and Gateway.  In the Third Interim Fee Application, MMM's fees incurred in connection with mediation were $45,039.50, which it divided by three for $15,013.17 attributed to Sugarloaf.  In the Fourth Interim Fee Application, MMM sought $2,019.00 in fees for mediation, which was also divided by three, for a charge of $673.00 for Sugarloaf.

Mr. Thakkar argues the mediation did not benefit Sugarloaf because the mediation focused on resolving the contribution claim of Bay Circle against NRCT.  He is clearly mistaken, as the order authorizing mediation specifically identified issues related to Sugarloaf and general topics, including reorganization and distribution of funds, applicable to all Debtors.  The Court concludes it is appropriate for Sugarloaf to share in the cost of mediation, as the time was intended to benefit Sugarloaf, as well as other Debtors.  The Court will consider below whether the division of fees among only three of the Debtors was proper.

   D.   Plan and Disclosure Statement

Mr. Thakkar argues the Trustee should not have spent time on a plan and disclosure statement but should have dismissed the case as he is now doing.  But Mr. Thakkar ignores the sequence of events that lead the case to be dismissed now, as opposed to earlier, and his role in it.

After the mediation concluded with no agreement, the Court scheduled a hearing to consider Mr. Thakkar's request for dismissal of the Sugarloaf case that was filed in May and July 2019. The Court denied the motion without prejudice. The Court then directed any eligible party who wanted to file a plan to do so by February 18, 2020. The Court further ordered that if no plan of reorganization was filed as to Sugarloaf by February 18, 2020, it would hold a hearing on February 19, 2020 for the parties to show cause why the case should not be converted to Chapter 7 (Case No. 15-58440 Doc. No. 1286). This order was consistent with the Court's direction to the Trustee when he was appointed to resolve the cases.

The Trustee filed a Chapter 11 Plan and Disclosure Statement as directed by the Court. It assumed Westmoore was owed $3 million plus interest and was secured by Sugarloaf's property. It proposed to either surrender the 1950 and 1970 Satellite Blvd. properties to Westmoore (if the value was less than $3 million) or to sell the 1950 and 1970 Satellite Blvd. properties and pay Westmoore in full (if the value exceeded $3 million). All unsecured claims would be paid in full and any funds remaining would be paid to equity.

Mr. Thakkar and his sons, Niloy and Rohan, also filed a Chapter 11 Plan and Disclosure Statement. Their plan assumed Simba/Red Chillies[5] held the secured claim. It made no mention of Westmoore. The plan proposed to pay all outstanding post-petition interest to Simba/Red Chillies as an administrative claim or superpriority claim and to surrender the 1950 and 1970 Satellite Blvd. properties to Simba/Red Chillies. The plan proposed to pay all unsecured creditors, other than Nilhan Financial, in full and to pay Nilhan Financial only if funds remained after all unsecured, secured, and administrative claims were paid. The two plans clearly benefitted different parties. The Trustee's plan provided for payment to Westmoore and Nilhan Financial,

---

[5] The Thakkar plan and disclosure statement referred to Red Chillies as Red Chili's.

while Mr. Thakkar's plan provided for payment and surrender of property to his own affiliated entity.

On April 20, 2020, Mr. Thakkar filed a Motion Requesting Establishment Of Deadlines And Procedures For Dismissal Of Bankruptcy Case of Sugarloaf Centre, LLC (Case No. 15-58440 Doc. No. 1392). In that pleading, he stated for the first time that he did not object to the Westmoore claim for $9,147,349.54 filed on April 14, 2020 and relented on his insistence that his affiliate be paid instead. He proposed a structured dismissal whereby the property would be surrendered to Westmoore, administrative claims and unsecured claims (other than Nilhan Financial) would be paid in full, Nilhan Financial would be paid 50% of its claim, and Westmoore would receive all remaining funds. The Trustee amended his plan on April 21, 2020 to provide for surrender, rather than a sale, of the Sugarloaf property in full satisfaction of Westmoore's claim. Because of the COVID pandemic, and nonpayment by tenants, the Trustee no longer believed a sale of over $3 million was possible. The Trustee still anticipated paying unsecured creditors, including Nilhan Financial, in full.

The time spent by MMM preparing the Sugarloaf plan and disclosure statement, and reviewing the Thakkar plans and disclosure statements, appears in its Fourth and Fifth Interim Fee Applications. The Fourth Interim Fee Application shows time from January 23, 2020 to February 28, 2020 incurred for Sugarloaf in connection with plans totaling only $4,602. It also lists time in the general fee category from January 16, 2020 through February 20, 2020 for plans and disclosure statements for three of the Debtors totaling $32,916.50, with $10,972.17 allocated to Sugarloaf. The Court finds no basis to reduce these fees. The Court directed the parties to file a plan and disclosure statement or risk conversion. Even Mr. Thakkar did not want the case converted, so the Court finds no fault in the Trustee preparing a plan and disclosure statement in response to the

24

Court's order.  The time spent preparing the plan and disclosure statement is reasonable and was necessary to the administration of the estate and beneficial to bringing the bankruptcy case to a close.

As to the Fifth Interim Fee Application, MMM spent time from March 3, 2020 to May 5, 2020 for Sugarloaf in connection with plans totaling only $9,847.50.  Of this, only $334.50 was charged after Mr. Thakkar filed his motion to dismiss on April 20, 2020 and stated he had no objection to the Westmoore claim.  MMM spent time on plans from March 2, 2020 to May 6, 2020 for three of the Debtors placed in the general category totaling $14,724.00 (of which $3,689.50 was incurred after April 20, 2020), allocating $4,908.00 to Sugarloaf.  As with the Fourth Interim Fee Application, the Court finds it was appropriate for the Trustee to pursue his own plan as well as to review and respond to Mr. Thakkar's plan.  Mr. Thakkar's plan did not contemplate full payment to Nilhan Financial and did not mention Westmoore, who the trustee had verified held a lien on the property.  The time in this category includes responding to Mr. Thakkar's motion and attending a hearing scheduled on an expedited basis.  The time was reasonably necessary and beneficial to the estate.

The Court also concludes that the time spent filing the Trustee's amended plan was reasonably incurred and beneficial to the estate at the time.  The plan was amended to reflect the reality of the pandemic.  Even though Mr. Thakkar had filed a motion for a structured dismissal the day before, the Trustee's amended plan was filed at virtually the same time and presented the Court with an alternative disposition of the case.  It is worth noting that at the hearing on April 30, 2020 the court dismissed the DCT case and converted the Bay Circle case, but it denied Mr. Thakkar's request for dismissal as to Sugarloaf, NRCT, and Nilhan Developers.  The Court cannot

fault the Trustee for spending time on a position with which the Court agreed. The Court finds no reason to reduce the fees spent in the "plan and disclosure statement" category.

### E.    Sale of 1930 Satellite Blvd

Mr. Thakkar contends MMM spent too much time on a "simple" sale of property. But the sale was not "simple." When the Trustee was appointed, he learned that Mr. Thakkar had entered into a contract with Discovery Funding for the sale of 1930 Satellite Blvd. The contract had not been submitted to the Court, although Mr. Thakkar states Court approval was contemplated in the contract. According to testimony, the contract included contingencies for zoning and required that Mr. Thakkar receive 20% of the equity in the project. To determine if he wanted to go forward with the proposed sale, or some other one, the Trustee initially asked counsel to conduct a title check. MMM discovered that 1930 Satellite Blvd. appeared to be unencumbered, but it found Westmoore held a lien on other property of the Debtor. MMM contacted Westmoore regarding its lien and the amounts due to it. MMM then obtained a full title report to ascertain who had an interest in the 1930 Satellite Blvd. property. The Trustee also specifically sought direction from the Court at a hearing on March 28, 2019 about whether he should pursue a potential sale of the property. The Trustee noted he did not want to spend the estate's money and did not want counsel to spend time reviewing contracts or pursuing the offers without the Court's guidance. The Court instructed the Trustee to proceed to explore the sale of Sugarloaf's properties and advocate accordingly. After these steps, MMM and the Trustee renegotiated the contract with Discovery Funding, removing the contingencies, eliminating Mr. Thakkar's equity interest, increasing the escrow amount, and shortening the closing period.

On April 8, 2019, the Trustee filed a motion seeking approval of the sale of 1930 Satellite Blvd. for $1.5 million to Discovery Funding LLC (Case No. 15-58440 Doc. No. 1069). The Court

held a hearing on the motion to sell on April 30, 2019.  Counsel for Gateway appeared and cross-examined the Trustee about the sale and the proposed marketing terms.  After reviewing the evidence, the Court approved the sale and granted the motion to sell on May 2, 2019 (Case No. 15-58440 Doc. No. 1033).

The 1930 Satellite property was subject to a Declaration of Easements and Restrictions for Sugarloaf Centre Commercial Owners Association and the Debtor was the declarant.  The purchaser wanted to build a hotel on the property and needed the Debtor's consent.  MMM researched and prepared the appropriate motion to obtain that consent (Case No. 15-58440 Doc. No. 1069).  The Court held a hearing and approved the request on June 20, 2019.  The Trustee then sold the 1930 Satellite Blvd. property to Discovery Funding, LLC on July 26, 2019 and generated proceeds in the amount of $1,437,961.68 (Case No. 15-58440 Doc. No. 1185).

Mr. Thakkar contends the time spent on these tasks is excessive and that a routine closing should have cost between $7,000-$10,000.  In the First Interim Fee Application, MMM incurred fees under "363 sales and settlements" totaling $29,110.00 for Sugarloaf, plus 1/5 of the general fees and expenses totaling $1,694.00 such that Sugarloaf's allocable share was $338.80.  This time was more than "just" selling the property at 1930 Satellite Blvd., contrary to what Mr. Thakkar contends, and was not routine  This First Interim Fee Application included time MMM spent learning about the property and the existing contract, doing the title work, communicating with Westmoore, and renegotiating the contract before work on closing a sale could begin.  The time in the First Interim Fee Application also includes settlement items not related to the sale of 1930 Satellite Blvd., such as settlement with several tenants at the Sugarloaf property.  It is worth noting that a sale in bankruptcy is more expensive than a sale outside of bankruptcy because a motion and hearing is required and interested parties may object.  That is certainly true here since the Court

27

held a couple of hearings regarding the sale, including one in which the Trustee was required to testify.

The Second Interim Fee Application reflects MMM's fees in this category totaled $33,529. This includes the approval of the sale, its closing, and addressing closing issues, such as consent to build a hotel on the 1930 Satellite Blvd. property. While the Court appreciates that $60,000 between the two applications may seem like a large amount for a sale, the Court has reviewed each entry and finds that the tasks were reasonable and necessary and performed in a reasonable fashion. While a number of entries reflect communication between lawyers, between lawyers and the Trustee, and between lawyers and the purchaser, the communication is not excessive and such communication is necessary. The Court also notes that the fees charged are only about 4% of the purchase price, which also does not appear unreasonable. The Court finds the fees were necessary and beneficial to the estate, resulting in over $1.4 million in proceeds to the estate.

F.    Time on Westmoore Claim

Mr. Thakkar complains that the time MMM spent investigating and litigating the Westmoore claim is and was unnecessary and of no benefit to the estate. This time is entered in the "claims administration" category. The time in the Fifth Interim Fee Application allocated to Sugarloaf for "claims administration" is $64,974.00, the time in the Sixth Fee Application for "claims administration" is $6,444.50, and the time in the Supplemental Application related to the motion to dismiss is $3,582.00. The total time spent investigating, litigating, and settling the Westmoore claim is $75,000.50.

Mr. Thakkar argues that, because he stated he did not oppose the Westmoore claim in papers he filed in April 2020, the Trustee and his counsel did not need to go any further. But Mr. Thakkar misunderstands the role of the Trustee and interprets necessity of services and benefit to

28

the estate too narrowly.  Pursuant to section 1106, a Chapter 11 trustee is required to investigate the liabilities of the Debtor and any other matter relevant to the case or to the formulation of a plan. 11 U.S.C. § 1106.  Thus, the Trustee was obligated to investigate the Westmoore claim, particularly given what appeared to be questionable dealings.

"Benefit" to the estate is measured by considering whether the services were necessary to the administration of, or beneficial toward the completion of a case under this title.  11 U.S.C. § 330(a)(3)(C).  As noted above, the appropriate time for measuring benefit to the estate is as of the time the services are provided, and not at the time the court ultimately reviews the fee application.  In addition, necessary and actual fees are allowable where the fees are unavoidably incurred in responding to events beyond counsel's control, such as responding to Mr. Thakkar's contrary plan and his failure to disclose information.

The Trustee discovered the Westmoore claim when he was first appointed and MMM reviewed title on the 1930 Satellite Blvd. property for a potential sale.  Westmoore was not a creditor when the case was filed, and it was not the party that made the post-petition loan to Sugarloaf.  There was no indication in the bankruptcy case of Westmoore's existence, so the fact it showed up in the chain of title was news to the Trustee and to the Court.  The Trustee and MMM conducted an initial investigation and obtained a payoff of $3 million plus interest from Westmoore, which they used in deciding how to proceed in the case.  Nothing more seems to be done regarding the Westmoore claim for several months, during which the parties were focused on the mediation.  It was not until a hearing on January 16, 2020, during which Mr. Thakkar vigorously opposed authorizing a broker to sell Sugarloaf's remaining real property, that Mr. Thakkar mentioned that the debt to Westmoore far exceeded $3 million.  He stated Simba still had a loan and completed a transaction with Red Chillies, but it was not entirely clear what transacted

between the lenders.  The Court noted there appeared to be a dispute as to the amount of the claim and instructed the parties to tee up the issue in an appropriate manner.

Both the Trustee and Mr. Thakkar filed plans.  The Trustee's Disclosure Statement filled in some of the blanks for the Court as to the Simba Note.  Not only had the Simba Note been assigned to Red Chillies, but it had then been assigned to Westmoore on October 4, 2018 in connection with a loan by Westmoore to another Thakkar entity, Redan Shops LLC.  The assignment occurred less than a week before the Court issued its Order to Show Cause related to the Nilhan Developers case, which ultimately led to the appointment of a Trustee.  Almost a year later, and months after a trustee was appointed in this case, Westmoore extended an additional $1 million of credit to Redan Shops and extended the maturity date of the Simba Note to January 31, 2020 without the Trustee's knowledge or consent, but with Mr. Thakkar's consent.[6]  The Simba Note approved by the Court served as collateral for this extension of credit.  As of the date of the Trustee's plan, the Simba Note was past due.

Westmoore was not mentioned in Mr. Thakkar's plan.  In effect under his plan, Mr. Thakkar would receive first dollar on post-petition interest and a surrender of the property.  On March 23, 2020, Mr. Thakkar amended his plan to clarify Red Chillies owned the note and the amount due on the claim exceeded $9 million.  Mr. Thakkar's Amended Plan still did not mention Westmoore.

When MMM's work regarding Westmoore ramped up after the hearing on March 24, 2020, the Trustee had a payoff letter from one lender for $3 million and a plan filed by an insider saying his entity actually held the Simba Note and was owed over $9 million.  This is a significant inconsistency, made even more suspicious by the fact an insider was involved.  The Court again

---

[6] By this time, Mr. Thakkar had no authority to act on behalf of Sugarloaf since the Trustee was in place.

notes that it was Mr. Thakkar's conduct that prompted the appointment of the Trustee in the first place.  Given the Trustee's duties, it was appropriate for MMM to investigate further.

The time entries indicate MMM made numerous requests for documents to get to the bottom of the issue and substantiate the claim.  MMM contacted counsel for Mr. Thakkar, counsel for Niloy and Rohan Thakkar, and counsel for Westmoore for documents.  While it appears Westmoore did produce some documents, it did not produce all the documents MMM requested. The evidence at the hearing showed Mr. Thakkar did not produce any documents.  Ultimately, MMM was forced to obtain an order authorizing the examination of Red Chillies and Mr. Thakkar and ordering the production of documents pursuant to Bankruptcy Rule 2004 on June 22, 2020 (Case No. 15-58442 Doc. No. 133).  MMM's time entries reflect it experienced difficulty serving the Rule 2004 Order on Mr. Thakkar, and the Trustee only received all the documents requested at the end of June 2020.  According to the Court's calculation, MMM incurred about $9,415 in connection with discovery.  Since the Trustee acted appropriately in investigating the considerable claim discrepancies, the parties did not freely provide the documents needed, and the requests were reasonable (no one ever asked the court for a protective order or to quash the subpoenas), the Court finds the fees MMM incurred in conducting discovery on the Westmoore claim are reasonable and necessary to the administration of the estate.

The Trustee objected to the Westmoore Proof of Claim on May 14, 2020 (Case No. 15-58442 Doc. No. 118), the deadline set by the Court.  At the time MMM filed the objection, Mr. Thakkar and Westmoore had not produced all the relevant documents to the Trustee, so MMM did not have all the documents needed to fully analyze the claim.  MMM explained in its objection why additional documents were necessary.  It stated, for example, that public documents reflected only that the Simba security deed was assigned to Westmoore, but not the Simba Note, which

31

suggested that Westmoore only held a collateral assignment and could not assert a claim. Moreover, the Simba security deed was only part of the collateral held by Westmoore, and the Trustee wanted to verify that it would be needed to satisfy the Westmoore obligation.  Given the lack of transparency, it was appropriate for MMM to file an objection to the claim.  The time records indicate that about $12,000 was incurred in preparing the written objection and attending the hearing.  While this is higher than expected, the Court cannot identify any entries it finds to be excessive and the work was necessary.  The Court holds this is allowable.

Around the same time, Westmoore filed a Motion for Relief from Stay on May 6, 2020 (Case No. 15-58442 Doc. No. 114), seeking to foreclose on the property.  The Trustee and his counsel needed to assess and respond to this motion.  MMM filed a limited response on behalf of the Trustee on May 26, 2020 in which he stated he did not object to surrendering the property to the appropriate holder of the Simba Note but, until he received discovery, he could not determine the identity of the appropriate party.  Though fairly simple, the response required work to decide the best approach.  The total time the Court finds associated with the motion for relief from stay is $7,160.50.  The Court concludes this time was necessary to respond to the motion, necessary to the administration of the estate, and reasonable in amount.

The Trustee and his counsel began exploring options to resolve the dispute.  Westmoore asserted it held a deficiency claim of approximately $6 million, which would virtually eliminate distributions to other creditors.  It also asserted it held an administrative expense claim for unpaid interest which, if true, would completely eliminate a distribution to unsecured creditors.  This was the position Mr. Thakkar took in his plan, in which he asserted his affiliate Red Chilies held the Simba Note.

32

The Trustee and Westmoore agreed to settle their disputes and filed a Motion to Approve Settlement Pursuant to Rule 9019 (Case No. 15-58442 Doc. No 143). The proposed settlement was not only about Westmoore but also contemplated dismissal of the case. After notice and a hearing, the Court approved the settlement (Case No. 15-58442 Doc. No. 152). The time spent on the settlement negotiations, preparing the various documents, and appearing at the hearing totaled $16,045.50 in the Fifth Interim Fee Application, $6,444.50 in the Sixth Fee Application, and $3,582.00 in the Supplemental Application for a total of $26,072.00. After reviewing the entries, the Court finds the time spent reasonable, necessary to the administration of the estate, and beneficial to the estate because it provided payment in full to all unsecured creditors (which Mr. Thakkar never provided for) and a dismissal of the case (which Mr. Thakkar wanted).

After deducting the fees the Court can identify with particular projects as discussed above, such as those objecting to Westmoore's claim, conducting discovery, responding to the motion for relief from stay, and settling the claim while providing for dismissal of the case, the Fifth Interim Fee Application seeks reimbursement of an additional $20,000.00 in fees in the "claims administration" category. The Fifth Interim Fee Application contains a few isolated entries about settlements with tenants and other miscellaneous matters, but virtually all of this time is spent reviewing the Westmoore claim, thinking about the Westmoore claim, and talking about the Westmoore claim (both within the firm and with the Trustee, Gateway, and Westmoore's counsel).

For example, on March 25, 2020, the time records reflect three entries totaling $914.50 indicating MMM attorneys talking to each other and to Ms. Richmond, counsel for Westmoore, about the Westmoore claim. On April 15 and 16, 2020, seventeen entries totaling $2,872.50 reflect attorneys repeatedly reviewing the proof of claim and the prior information they received, talking to each other and communicating with Mr. Glass. Entries on May 4 and 5, 2020 totaling $1,957

33

reflect continuing conversations between MMM attorneys and with Gateway's attorney, and continuing review of MMM's prior information on Westmoore.  The time entries on May 7, 2020 continue to reflect more conversations, totaling $914.50.  Time spent between June 15 and June 18, 2020 again is heavy on conversations among MMM attorneys, with counsel for Rohan and Niloy Thakkar, and with Mr. Glass.  The time spent communicating during this period totals $2,635.  Finally, on July 1, 2020, MMM incurred $2,048 in fees again with extended conversations among MMM lawyers and with Mr. Glass regarding the Westmoore claim.  These entries total $11,341.50.

The question is whether this additional time is reasonable and necessary.  Certainly, learning Westmoore's new position was a "curveball" to the Trustee and his counsel and they were justifiably suspicious of Mr. Thakkar's position.  The Court recognizes that communications, whether via email, phone, or in person, are necessary.  But here, the time the Court has highlighted is in addition to communications directly related to discovery, objecting to the Westmoore claim, responding to the Westmoore motion for relief from stay, and settling the Westmoore claim.  And here it appears MMM lawyers duplicated some work.  Accordingly, the Court will reduce the time in the Fifth Interim Fee Application "claims administration" by $5,670.75.

G.    Work Benefitting Gateway

Mr. Thakkar contends the Trustee should have taken virtually no action after the sale of 1930 Satellite Blvd. was approved on May 2, 2019 and MMM should not be compensated for its time thereafter.  He contends that, after the sale, no other actions benefited the estate.  The estate had approximately $1.4 million in net proceeds that were unencumbered and sufficient to pay all unsecured claims and administrative expenses.  Mr. Thakkar argues that all other actions were for the benefit of Gateway, which should bear its own expenses, and the Trustee should not have taken

positions on Gateway's behalf.  The Trustee and MMM argue they owed a duty to all claimants and constituencies to investigate claims and to provide for equal treatment to all creditors, even if Gateway benefitted.

As stated above, Gateway's claims against Mr. Thakkar personally, against his sons, and against various non-debtor entities have lurked behind these cases from the beginning.  But the Court has always attempted to only rule on matters involving these Debtors and to not otherwise rule, or even hear, about the Gateway claims.  The Court disallowed all of Gateway's claims, except its secured claim against Bay Circle.  The Court denied its motions for relief from stay. The Court ruled in favor of Bay Circle in two adversary proceedings involving Gateway.  The Court denied Gateway's motion for substantive consolidation and its request to pierce the corporate veil.  The Court previously expressed its opinion, in connection with plan confirmation in several of the cases, that it is not obligated to decide disputes between Gateway and the Thakkars involving ownership of the Debtors.  Accordingly, the Court is aware of and alert to Mr. Thakkar's concern.  At the same time, though, this Court is not an instrument of Mr. Thakkar's to be manipulated against Gateway.  And the mere fact Gateway may benefit from a proper disposition of property and claims in this case is not a reason for the Trustee to avoid taking those actions.  To evaluate the Trustee's motives and decisions, the Court must view them in the light of the information available and the positions taken by the parties at the time.

Mr. Thakkar argues the Trustee did not need to try and sell 1950 and 1970 Satellite Blvd. and any sale would only generate proceeds for equity, including Gateway.  Shortly after the Trustee was appointed, the Trustee filed an Application to Employ Akerman & Co. as Real Estate Broker with Respect to Sugarloaf Centre, LLC Property (Case No. 15-58440 Doc. No. 994), and Documents in Support of Application to Employ Akerman & Co. as Real Estate Broker with

Respect Sugarloaf Centre, LLC Property (Case No. 15-58440 Doc. No. 1002).  The Court held a

hearing on the applications on March 28, 2019.  The Court did not authorize retention of a broker

as to 1950 and 1970 Satellite Blvd., but it stated the application could remain on the docket and

the Trustee could seek to have the matter heard again at a later time.  The Trustee noted he had

received a conditional offer, and the Court allowed the Trustee to continue to consider a sale of

the property if appropriate.  At that time, the Trustee believed that the secured debt on the property

(the Simba Note) totaled only $3 million and, according to the Court records, the maturity date

was October 2019.  He believed there was equity in the property and did not want equity to lose

any value by virtue of a motion for relief from stay and foreclosure after the maturity date.

Moreover, a secured creditor is a creditor in the case and is entitled to be paid, so it was appropriate

for the Trustee to consider a means to pay the secured claim.

The Application to Employ Akerman remained on the docket.  After the sale of the 1930

Satellite Blvd. property, all parties engaged in mediation concerning several issues including

whether additional property should be sold.  When the mediation concluded with no agreement,

the question was what to do next.  After a hearing on January 16, 2020, the Court denied the

application to retain a broker to market Sugarloaf's remaining property without prejudice, stating

it wanted to see where the case was headed and whether it would be necessary to sell additional

property, because it appeared that sufficient funds existed to satisfy Sugarloaf's creditors.  MMM

spent no more time on an attempted sale after this date.

At the January 16, 2020 hearing, the Court also announced it would set deadlines to move

the cases towards resolution and an ultimate disposition.  The Court set February 18, 2020 as the

deadline for filing plans, absent which the Court would convert the Sugarloaf case to Chapter 7.

Still believing there was equity in the Sugarloaf property, the Trustee decided to file a Chapter 11

plan rather than convert the case.  While Gateway may have benefited from any equity in the property by virtue of its claim to NCT, the Thakkars also benefited from equity.

Mr. Thakkar also opposed conversion and filed his own plan.  His plan, though, set off a fire storm of confusion.   Rather than identifying the secured creditor known to the Trustee (Westmoore), Mr. Thakkar took the position that the secured debt was held by Red Chillies, which he managed.  He failed to state the amount allegedly owed.  Even more importantly, Mr. Thakkar took the position that unpaid interest was an administrative expense claim and that the unsecured claim of Nilhan Financial would only be paid after all administrative expense claims, secured claims, and unsecured claims were paid.  Thus, he proposed to distribute cash to himself first, surrender the property to his company, Red Chillies, and pay Nilhan Financial nothing.  The Court views this as part of Mr. Thakkar's ongoing litigation strategy against Gateway.

Nilhan Financial was a Thakkar affiliate and was scheduled by Sugarloaf as being owed $146,367.00 as an undisputed and unliquidated debt.  However, Nilhan Financial ended up in a Chapter 7 bankruptcy case of its own in Florida as a result of Gateway's collection efforts. Gateway stood to receive 50% of any distributions received by the Nilhan Financial Trustee.  As stated above, the fact Gateway may benefit is not a reason to disregard the Bankruptcy Code and the obligations of the Trustee.  The Trustee rightfully found the refusal to pay Nilhan Financial inappropriate since Nilhan Financial retained an allowed unsecured claim.  Moreover, the Trustee was justifiably suspicious that suddenly the principal of the Debtor claimed to own the secured debt and asserted his company should receive virtually all the cash and the real property.  As explained above, an investigation into the facts was warranted, and not primarily for Gateway's benefit.

Mr. Thakkar urges the Court to find the Trustee was acting only to protect a potential Gateway interest in the equity of the equity holder by objecting to Westmoore's claim and that such actions were inappropriate. The Court disagrees. At this point, the Trustee was still trying to get the documents from Mr. Thakkar and/or Westmoore to substantiate who held the debt and the balance due thereon. Once those were obtained, the Trustee did exactly what Mr. Thakkar wanted and proceeded to negotiate a settlement that resulted in subordinating Westmoore's claim and dismissing the case with one noticeable difference: the settlement pays Nilhan Financial in full in accordance with the Bankruptcy Code.

Reviewing all the facts in the light of what was known at the time, the Court does not find the Trustee acted only on behalf of Gateway. Mr. Thakkar is correct that the fees in this case are greater than expected, but that is largely driven by Mr. Thakkar's own actions and the failure of Mr. Thakkar and Westmoore to be fully transparent when the issue of the secured debt came to light. The Court finds MMM's fees were unavoidably and necessarily incurred by counsel responding to these events outside its control. The Court finds no basis for reducing the fees as being for Gateway's benefit.

H.    Allocation of "General" Time

The Trustee was appointed in all five of the related cases, and MMM was authorized to represent the Trustee in all five cases. MMM charged its time to a specific debtor if the work was for one debtor only, but where the work was for more than one debtor, the time was aggregated in a "general" category and divided among Debtors. The general time in the First Interim Fee Application was divided by five Debtors, the general time in the Second Interim Fee Application was divided by four Debtors (excluding DCT), and the general time in the rest of the applications

was divided by three (excluding DCT and Bay Circle). Mr. Thakkar argues that the "general" time should have been divided differently and that some of the "general" time was for a specific debtor.

When the Trustee was appointed, DCT held no assets as its property was sold or foreclosed on to satisfy the Wells Fargo debt. Bay Circle's only asset at the time the Trustee was appointed was a potential contribution claim against the other Debtors. Nilhan Developers, Sugarloaf, and NRCT continued to hold real property and other assets. All five cases remained under the supervision of the Trustee until the DCT case was dismissed on May 1, 2020 and the Bay Circle case was converted on May 5, 2020.

The Court finds that unless the work done for a particular debtor was truly de minimis, all of the Debtors should share equally in the general time. Moreover, if the work was performed for fewer than all the Debtors, only those for whose benefit the work was done should share in the cost. The Court reviewed all the time entries in the "general" categories and agrees with Mr. Thakkar that some of the time should be allocated to a specific debtor and, in general, the time should have been allocated to four Debtors instead of three until the Bay Circle case was converted.

The Court concludes the time in the Second Interim Fee Application should have been divided by five, as all five Debtors were the subject of the group work, other than the time for claims administration that only impacted Sugarloaf, Nilhan Developers, and NRCT. The Court finds the time in the Third Interim Fee Application should have been divided by four because the Bay Circle case remained active during this period, but that the time for preparing fee applications should be divided by five as all Debtors were included in the application for which time was billed. The Court finds the time in the Fourth Interim Fee Application related to plans should be divided by four because plans were filed for all the Debtors other than DCT. Similarly, the time incurred for the mediation in the sales and settlement category should be allocated to all Debtors other than

DCT because all were involved in the mediation, as discussed above.  Division of other categories by three is appropriate.  In the Fifth Interim Fee Application, the Court concludes the division by three is appropriate, with a reduction for the charges specifically attributable to the conversion of Bay Circle and the dismissal of DCT.  Although these entities may not have funds to pay fees, it is not appropriate to charge those fees to the other three Debtors that have funds.  Attached hereto as Exhibit A is a chart of the Court's revisions to each of the Applications, both for specific time entries and for the division of the general fees that were incorrectly charged to Sugarloaf.  These reductions total $20,254.76.  However, MMM may seek compensation in the other Debtors' cases where the Court has indicated the time is allocable to other Debtors.

     I.    <u>Time Defending Applications</u>

In its Supplemental Fee Application MMM seeks $36,631.50 in fees for its time spent defending the Applications against opposition.  Mr. Thakkar opposes these fees and contends a bankruptcy court cannot award attorney's fees under section 330(a)(1) for work performed in defending a fee application in court pursuant to the Supreme Court's decision in <u>Baker Botts, LLP v. ASARCO, LLC</u>, 576 U.S. 121 (2015).

In <u>ASARCO</u>, the bankruptcy court authorized the debtor in possession, ASARCO, to retain Baker Botts as counsel to represent it in its Chapter 11 case.  ASARCO reorganized and Baker Botts filed its final application for compensation seeking compensation under section 330.  ASARCO objected to the amount of compensation.  The bankruptcy court awarded Baker Botts compensation for representing the estate in the Chapter 11 case and for fees incurred in litigating the fee application with ASARCO.  The Fifth Circuit Court of Appeals reversed as to the reimbursement of the fees incurred in defending the law firm's fee applications, and the Supreme

Court agreed with the Fifth Circuit that section 330(a) does not permit compensation for fee-defense litigation.  ASARCO, 576 U.S. at 124.

The Supreme Court started with the presumption that the American Rule applied and prohibited shifting attorney's fees from one party to another unless a statute or contract provided otherwise.  In ASARCO, the debtor's counsel was litigating against the estate, so requiring the estate to pay the fees of the attorney would shift the responsibility for paying the fees.  Id. at 128.  The Court then looked to see if there was a statutory provision that would override the American Rule and permit bankruptcy courts to award compensation to counsel for its fee-defense litigation.  The Court examined section 330 and concluded "litigation in defense of a fee application is not a 'service' within the meaning of § 330(a)(1)" for which counsel could be compensated.  Id. at 131.  The Court acknowledged that fees can be awarded for work performed in *preparing* a fee application under section 330(a)(6), but it found no similar basis for approving compensation for fees incurred in *defending* a fee application.  Id. at 132.  The Supreme Court concluded: "Section 330(a)(1) itself does not authorize the award of fees for defending a fee application, and that is the end of the matter."  Id. at 134.

MMM argues that while attorney's fees are generally not compensable for defending a fee application, the result is different where a professional employed by the estate seeks fees incurred to defend its fees against an attack brought by a party other than the estate.  MMM relies on In re Macco Props., 540 B.R. 793, in which the bankruptcy court concluded ASARCO was inapplicable where the Chapter 11 trustee and estate professionals sought compensation from the estate and were defending their applications against third party objections.  The Macco Props. court pointed out that the case before it involved the estate defending itself against a third-party, counsel and the trustee were not adversaries, and therefore it did not implicate the American Rule on fee shifting

41

as the estate was paying its own fees.  The court then concluded that, under section 330(a)(1), counsel's work defending its fee application constituted an "actual, necessary service" for the Chapter 11 trustee in completing the administration of the estate.  Id. at 878.

Subsequent courts have disagreed that ASARCO is limited to circumstances in which the estate objects to a fee application[7] because, contrary to the determination by the court in Macco Props., defending a fee application is not a service that is necessary to complete the administration of the estate.  As one court explained, "[a] trustee simply is not rendering a 'service' to a bankruptcy estate by defending his own application." In re Morreale, 2019 WL 3385163, at *12 (Bankr. D. Colo. July 3, 2019) (citing ASARCO, 576 U.S. at 131); see also In re Stanton, 559 B.R. 781, 782 (Bankr. M.D. Fla. 2016) (stating ASARCO held that section 330(a) does not authorize attorney's fees for work performed defending a fee application because that work is not performed for the estate").  Even the dissent in ASARCO recognized that "a professional's defense of a fee application is not a 'service' within the meaning of the Code." Id. at *7 (quoting ASARCO, 576 U.S. at 136).  In defending fee applications, counsel is not rendering a service that will benefit the bankruptcy estate; instead, fee defense work is done for the benefit of the professional.

The Court finds ASARCO prohibits the Trustee's professionals from collecting fees incurred in defending their fee applications.  Because the expenses incurred by MMM are subject to review under section 330, and because the Supreme Court's binding decision in ASARCO clearly states litigation in defense of a fee application is not a "service" within the meaning of section 330(a)(1) for which counsel could be compensated, the Court holds MMM is not entitled to fees incurred in defending the Applications.

---

[7] As some have noted, "[e]ven in circumstances where bankruptcy debtors or trustees do not object, fee defense fees are still not compensable."  In re Morreale, 2019 WL 3385163, at *9 (Bankr. D. Colo. July 3, 2019).

Courts recognize, however, that in certain circumstances they may award fees as a sanction for abusive litigation tactics. Bankruptcy courts have authority under Bankruptcy Rule 9011, the bankruptcy counterpart to Fed. R. Civ. P. 11, which provides a court may sanction a party who files a document for an improper purpose, such as to harass or to cause unnecessary delay or cost. Fed. R. Bankr. P. 9011(b), (c); Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991). Bankruptcy courts can also impose sanctions under section 105 to punish an attorney who "unreasonably and vexatiously multiplies the proceedings before them." In re River Rd. Hotel Partners, LLC, 536 B.R. 228, 242 (Bankr. N.D. Ill. 2015) (quoting In re Volpert, 110 F.3d 494, 500 (7th Cir. 1997)). The Court also has the inherent power to sanction a litigant for bad-faith conduct, but such power must be exercised with "restraint and discretion." Chambers, 501 U.S. at 44. Sanctions are the exception, not the norm, and should not be imposed lightly, "even in the face of aggressive litigation tactics and strategy." Kramer v. Mahia (In re Khan), 488 B.R. 515, 528 (Bankr. E.D.N.Y. 2013), aff'd sub nom. Dahiya v. Kramer, 2014 WL 1278131 (E.D.N.Y. Mar. 27, 2014), aff'd, 593 F. App'x. 83 (2d Cir. 2015).

Sanctions are not appropriate in this case. MMM does not argue Mr. Thakkar violated Rule 9011, and the Court does not find Thakkar's objections were made in bad faith or for an improper purpose. Mr. Thakkar aggressively pursued his objections and the Trustee's professionals were equally aggressive in their defense. Just because Mr. Thakkar pursued his objections does not mean he engaged in an abuse of the judicial process or conduct that unreasonably and vexatiously multiplied the proceedings. Substantial fees and expenses are at stake in this case, and Mr. Thakkar acted to protect his interests and undoubtedly believed his objections were well-founded. The Court has agreed with Mr. Thakkar on certain points. The standards for imposing sanctions are necessarily stringent and have not been satisfied here.

Accordingly, the Court will not impose sanctions.  The Court finds MMM is not entitled to recover the $36,631.50 incurred in preparing for and participating in hearings on the Applications.

## V.    CONCLUSION

For the reasons stated above, the Court has disallowed some fees sought in prior applications and some fees sought in the Sixth and Final Fee Application and Supplement.  It has disallowed $20,254.76 in fees allocable to other Debtors, $5,670.75 in fees in connection with Westmoore's claim, and $36,631.50 of fees incurred in connection with defending the fee applications.  This totals $62,557.01.  MMM sought $72,644.48.  So MMM is awarded $10,087.47 in fees in addition to all fees previously approved.  All fees previously awarded are approved on a final basis.

**<u>END OF ORDER</u>**

## Exhibit

### Revisions to MMM's Second Interim Fee Application

Bankruptcy Case Administration (General)

    $10,654.50 was divided by 3 – should be 5
    Reduction - $1,420.60

Fees and Employment (General)

    $17,414.50 was divided by 3 – should be 5
    Reduction - $2,321.93

Bankruptcy Motions (General)

    $1,243.50 was divided by 3 – should be 5
    Reduction - $165.80

Bankruptcy Other Professionals (General)

    $1,410.00 was divided by 3 – should be 5
    Reduction - $188.00

Bankruptcy Sale & Settlement (General)

    $56.00 was divided by 3 – should be 5
    Reduction - $7.57

**Total Reduction in MMM's Second Interim Fee Application:**

| |
|---:|
| **$1,420.60** |
| **$2,321.93** |
| **$165.80** |
| **$188.00** |
| **$7.57** |

        **$4,103.90**

**Revisions to MMM's Third Interim Fee Application**

Bankruptcy Claim Administration (General)

| Date | Time | Amount | Reason |
|------|------|--------|--------|
| 10/29/2019 | 0.2 | $28.00 | Only applies to ND/NRCT |
| 10/29/2019 | 0.4 | $56.00 | Only applies to ND/NRCT |

Reduction - $84.00 – 1/3 to SL   $28.00
Remaining General Time of $3,953.50 should be divided by 4 – reduction of $329.45

Fees and Employment (General)

$3,752.50 was divided by 3 – should be 5
Reduction - $500.33

Sale and Settlement

$45,039.50 was divided by 3 – should be 4
Reduction - $3,753.29

Bankruptcy Case Administration (General)

| Date | Time | Amount | Reason |
|------|------|--------|--------|
| 9/19/2019 – 9/30/2019 | | $8,058.00 | Only applies to ND – was divided by 3 |

Reduction - $2,686.00
Remining General Time of $2,830.00 should be divided by 4 – reduction of $235.83

**Total Reduction in MMM's Third Interim Fee Application:**

| |
|---|
| **$28.00** |
| **$329.45** |
| **$500.33** |
| **$3,753.29** |
| **$2,686.00** |
| **$235.83** |

**$7,532.90**

**Revisions to MMM's Fourth Interim Fee Application**

Plan and Disclosure Statement – General

$32,916.50 should be divided by 4 as 4 plans were filed.
Reduction:  $2,743.04

Bankruptcy Claims Administration – General

All time entries from 12/9/2019 to 1/10/2020 ($6,758) only apply to NRCT/ND–were divided by 3
Reduction: $2,252.67

Bankruptcy 363 Sale and Settlement (General)

All time entries from 11/14/2019 through 11/18/2019 ($2,019.00) relate to mediation and should be divided by 4
Reduction: $168.25

Bankruptcy Case Administration (General)

| Date | Time | Amount | Reason |
|------|------|--------|--------|
| 12/16/2019 | 0.2 | $123.00 | Only applies to BC |
| 12/16/2019 | 0.2 | $123.00 | Only applies to BC/DCT |
| 12/16/2019 | 0.4 | $222.00 | Only applies to BC/DCT |

Reduction: $468.00 – 1/3 charged to SL = $156.00

Bankruptcy Motions (General)

| Date | Time | Amount | Reason |
|------|------|--------|--------|
| 11/27/2019 | 0.2 | $127.00 | Only applies to BC/ND |
| 11/27/2019 | 0.1 | $55.50 | Only applies to BC/ND |
| 12/6/2019 | 1.0 | $555.00 | Only applies to BC/ND |
| 12/6/2019 | 0.7 | $388.50 | Only applies to BC/ND |

Reduction: $1,122.00  - 1/3 charged to SL = $374.00

**Total Reduction in MMM's Fourth Interim Fee Application:**

| |
|---|
| **$2,743.04** |
| **$2,252.67** |
| **$168.25** |
| **$156.00** |
| **$374.00** |

**$5,693.96**

**Revisions to MMM's Fifth Interim Fee Application**

Plan and Disclosure Statement – General

| Date | Time | Amount | Reason |
|------|------|--------|--------|
| 4/8/2020 | 0.6 | 87.00 | Only applies to NRCT/ND |
| 4/8/2020 | 0.3 | 43.00 | Only applies to NRCT/ND |
| 4/9/2020 | 0.5 | 152.50 | .2 should be charged to BC ($61.00) |
| 4/15/2020 | 0.9 | 130.50 | Only applies to NRCT/ND |
| 4/30/2020 | 2.5 | 1,600.00 | .5 should be charged to BC/ND ($320.00) |
| 4/30/2020 | 2.0 | 1,150.00 | .5 should be charged to BC/ND ($287.50) |
| 4/30/2020 | 1.7 | 518.50 | .5 should be charged to BC/ND ($152.50) |

Reduction: $1,081.50 – 1/3 charged to SL = $360.50

Bankruptcy Claims Administration – SL

| Date | Time | Amount | Reason |
|------|------|--------|--------|
| 5/1/2020 | 0.2 | 115.00 | ½ should be ND ($57.50) |
| 5/4/2020 | 0.6 | 384.00 | ½ should be ND ($192.00) |
| 5/4/2020 | 0.5 | 320.00 | Only applies to ND |
| 5/8/2020 | 0.6 | 384.00 | Only applies to ND |
| 5/26/2020 | 0.2 | 128.00 | Only applies to ND |
| 6/17/2020 | 0.2 | 128.00 | Only applies to ND |
| 7/8/2020 | 0.2 | 128.00 | Only applies to NRCT |

Reduction:  $1,337.50

Bankruptcy Claims Administration – General

| Date | Time | Amount | Reason |
|------|------|--------|--------|
| 3/23/2020 | 0.3 | 172.50 | Only applies to NRCT/ND |
| 5/4/2020 | 1.0 | 575.00 | .5 only applies to NC ($287.50) |
| 5/27/2020 | 0.4 | 122.00 | Only applies to BC |

Reduction:  $582.00 – 1/3 charged to SL = $194.00

Bankruptcy Case Administration – General

| Date | Time | Amount | Reason |
|------|------|--------|--------|
| 3/31/2020 | 0.2 | 128.00 | Only applies to DCT |
| 3/31/2020 | 0.1 | 30.50 | Only applies to DCT |
| 4/1/2020 | 0.4 | 256.00 | Only applies to BC |
| 4/3/2020 | 0.2 | 128.00 | Only applies to BC |
| 4/3/2020 | 0.2 | 115.00 | Only applies to BC |
| 4/8/2020 | 0.2 | 128.00 | Only applies to BC |
| 4/8/2020 | 0.1 | 57.50 | Only applies to DCT |
| 4/20/2020 | 0.1 | 30.50 | Only applies to ND |
| 5/1/2020 | 0.3 | 192.00 | Only applies to BC |
| 5/4/2020 | 0.3 | 172.50 | Only applies to BC |
| 5/5/2020 | 0.3 | 192.00 | Only applies to BC |
| 5/14/2020 | 0.5 | 287.50 | Only applies to BC |
| 5/18/2020 | 1.5 | 457.50 | Only applies to BC |
| 5/18/2020 | 1.0 | 305.00 | Only applies to BC |
| 5/18/2020 | 0.4 | 122.00 | Only applies to BC |
| 5/28/2020 | 0.2 | 128.00 | Only applies to BC |
| 5/28/2020 | 1.2 | 366.00 | Only applies to BC |

Reduction:  $3,096 – 1/3 charged to SL = $1,032.00

**Total Reduction in MMM's Fifth Interim Fee Application:**

| |
|---|
| **$360.50** |
| **$1,337.50** |
| **$194.00** |
| **$1,032.00** |
| **$2,924.00** |

**Distribution List**

Lisa Wolgast
Frank W. DeBorde
Morris, Manning & Martin, LLP
3343 Peachtree Rd., N.E., Suite 1600
Atlanta, Georgia 30326

M. Denise Dotson
M. Denise Dotson, LLC
PO Box 767
Avondale Estates, GA 30002

Valerie K. Richmond
Burr & Forman LLP
171 17th Street, Suite 1100
Atlanta, Georgia 30363

Walter E. Jones
Balch & Bingham LLP
30 Ivan Allen Jr. Boulevard, N.W., Suite 700
Atlanta, GA 30308

Clay M. Townsend
Morgan & Morgan, P.A.
20 North Orange Avenue, Suite 1500
Orlando, FL 32801

Paul Reece Marr
Paul Reece Marr, P.C.
Suite 960
300 Galleria Parkway, N.W.
Atlanta, GA 30339

Henry F. Sewell, Jr., Esq.
Law Offices of Henry F. Sewell, Jr. LLC
2964 Peachtree Road, NW
Suite 555
Atlanta, Georgia 30305

David Weidenbaum
Office of the U.S. Trustee
Room 362
75 Ted Turner Drive, SW
Atlanta, Georgia 30303